# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

DUANE ANGLETON, et al.,

      *Plaintiffs*,

vs.

COFFEYVILLE RESOURCES REFINING & MARKETING, LLC,

      *Defendant*.

Case No. 08-1255-EFM

## MEMORANDUM AND ORDER

Plaintiffs are seeking recovery for damages they allegedly incurred as a result of approximately 90,000 gallons of crude oil, diesel, and other pollutants being released from Defendant's refinery into the Verdigris River. This matter is now before the Court on the following motions: Defendant's motion to sever the plaintiffs for trial (Doc. 156), Defendant's motion to strike affidavits submitted by Plaintiffs in support of their response to Defendant's summary judgment motion (Doc. 153), and Defendant's motion for partial summary judgment (Doc. 140). For the reasons stated below, the Court denies all of Defendant's motions.[1]

---

[1]In a separate, but factually similar, case, *Eastman v. Coffeyville Res. Ref. & Mktg., LLC*, 10-1216-MLB, the presiding judge certified a number of questions to the Kansas Supreme Court that are relevant to the matter at hand. Neither party, though, has asked the Court to stay this case pending the resolution of those questions. As a result, the Court will forge ahead.

# I. BACKGROUND

Defendant operates an oil refinery in Coffeyville, Kansas, that is adjacent to the Verdigris River. On June 30, 2007, at 6:30 p.m., due to the tremendous amount of rain that the Verdigris River basin had received, and the fact that it was predicted that flood waters would come close to entering the refinery, Keith Osborn, the refinery's general manager, held a meeting with his employees to inquire about the refinery's activities. During the meeting, one of Defendant's employees, who had been tasked with the duty of measuring the elevation of the rising water, reported that in approximately four and a half hours the refinery's levee would be breached. At 7:50 p.m., Osborn made the decision to shut down the plant, a task that normally would take at least one day to accomplish. A few minutes later, the decision was made to pump an additional four feet of oil into Tank 8010, a forty-eight feet tall tank capable of holding 80,000 barrels of oil, because, at the time, it was filled only to the twenty-eight feet mark. According to Defendant, the purpose of adding the additional oil was to reduce the risk that the tank would float off its foundation if the refinery actually flooded. It was intended that the tank's inlet valve would be closed by the Oil Transfer System ("OTS") operator once the desired height was reached.

At 11:15 p.m., the flood waters breached the refinery's levee and started flowing into the plant.[2] A little over an hour later, the pumps to Tank 8010 were shut down because the oil was approaching the thirty-two feet mark. However, the inlet valve to the tank was not shut, thus enabling oil to continue to be gravity fed from the East Tank Farm, which is approximately three

---

[2]Plaintiffs contend that the water entered the plant in the afternoon of June 30. In support of this contention, Plaintiffs cite to photos taken by one of Defendant's employees that purportedly show a number of Defendant's oil tanks surrounded by water on the afternoon of June 30. The problem with this evidence is that some of Defendant's oil tanks sit outside of the refinery's levee, and are thus outside of the plant. Without clarification as to whether the depicted oil tanks are ones inside of the refinery's levee, the Court cannot find that Plaintiffs have controverted Defendant's properly supported fact that flood waters did not enter the plant until 11:15 p.m.

miles away and is located on the other side of the river, to Tank 8010 at a rate greater than 1,500 barrels per hour. According to Bill Edens, the manager of the pipelines division, which is the division in charge of the East Tank Farm and is headquartered in Bartlesville, Oklahoma, a town forty-five miles away from the refinery, he had the capability of electronically closing the valve on the feeding tank in the Farm. However, he did not close the valve when he turned off the pumps because the normal practice was to control the inflow into Tank 8010 by opening or closing the valve at the refinery.

Sometime in the early morning hours of July 1, Gary Martin, a member of the OTS department, called into the plant to let Defendant know that the inlet valve to Tank 8010 may not have been closed.[3] At approximately 7:00 a.m., Steve Lafferty, an employee at the refinery, called Edens to inform him that Tank 8010's inlet valve had not been shut and to ask if he could electronically close the valve on the tank feeding Tank 8010.[4] Edens responded that he could not accommodate Lafferty's request because the East Tank Farm had lost power a few hours earlier. Edens and Lafferty discussed alternative ways that the feeding tank's valve could be closed. The idea of taking a boat to the East Tank Farm was brought up, but was rejected, as Lafferty thought the water was too swift and dangerous. The idea of having a Bartlesville employee drive to the Farm was also brought up. However, Edens rejected it after looking at the maps available to him and considering the weather reports.

---

[3] It is unclear from the record when the call was made. Defendant's statement of facts implies that the call was made sometime before 7:00 a.m. Plaintiffs allege, though, that the call was not made until, at the earliest, 7:30 a.m.

[4] The record is unclear as to whether Edens knew that the valve was not closed. At his deposition, when asked if someone had called to let him know that the inlet valve to Tank 8010 could not be shut, Edens responded yes. *See* Doc. 149-13, p. 23. A few seconds later, however, Edens stated that the phone call he received revealed that it was possible that the valve may have been missed. *See id.* Because this case is at the summary judgment stage, the Court will construe this testimony in the light most favorable to Plaintiffs, i.e., that Edens knew that the valve was not shut.

At approximately 8:00 a.m., Edens started calling around trying to find a helicopter able to take personnel to the East Tank Farm to close the valve. The first helicopter service he called did not get back to him until 8:45. Unfortunately, both of the service's helicopters were down for repairs. It was not until 9:15 that Edens was able to actually secure a helicopter. According to Edens, the helicopter was to land at the highest point in Coffeyville, the town's football stadium, sometime between 10:30 and 10:45 a.m. At 9:00 a.m., Edens asked two of his employees at the Bartlesville plant to drive up to Coffeyville, to ride in the helicopter with Keith Osborn, and to close the feeding tank's valve.[5] The helicopter did not arrive until 11:00 a.m.

As the helicopter flew over the refinery, Osborn saw oil coming down the side of Tank 8010. This is when Osborn first learned that Tank 8010 was in fact releasing oil. Once the helicopter reached the East Tank Farm, the two employees that had joined Osborn closed the feeding tank's valve. Defendant estimates that the release began sometime between 10:15 and 10:30 a.m and stopped sometime between 11:15 and 11:30 a.m. During this time, nearly 80,000 gallons of oil were released from Tank 8010. Approximately 5,000 gallons of diesel oil were released from Tank 8050,[6] and 4,000 gallons of crude oil fractions were released from the refinery's sewer system.[7] The flood waters carried the oil-based substances downstream and into Oklahoma.

On July 3, Edens and another employee drove to the East Tank Farm from Bartlesville. To make this trip, Edens and the employee had to travel over 281 miles. Edens contends that it took one hour to plan the trip, and three hours to travel it.

---

[5] The East Tank Farm was not flooded.

[6] This release was due to this tank being moved off its foundation.

[7] This release was due to the system being flooded.

The record reveals that oil-based substances remained on Plaintiffs' property following the flood. According to Defendant, it has paid over $50,000,000 to parties affected by the release. During his deposition, Gary Martin stated that he had not heard of anyone getting in trouble over the July 1 release. On August 19, 2008, Plaintiffs filed the current action, asserting the following theories of recovery: (1) a violation of the Oil Pollution Act of 1990; and (2) absolute nuisance. They also are seeking punitive damages.

## STANDARD OF REVIEW

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[8] A dispute is genuine "if the evidence allows a reasonable jury to resolve the [dispute] either way."[9] A fact is "material" when "it is essential to the proper disposition of the claim."[10] The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.[11]

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact.[12] In attempting to meet this standard, the moving party need not disprove the nonmoving party's claim; rather, the movant must simply point out the lack of evidence on an essential element of the nonmoving party's claim.[13]

---

[8] Fed. R. Civ. P. 56(a).

[9] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[10] *Id.*

[11] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[12] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[13] *Id.* (citing *Celotex*, 477 U.S. at 325).

If the moving party carries its initial burden, the party opposing summary judgment cannot merely rest on the pleadings but must bring forth "specific facts showing a genuine [dispute] for trial."[14] The opposing party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[15] "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[16] Conclusory allegations alone cannot defeat a properly supported motion for summary judgment.[17] The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[18]

Finally, summary judgment is not a "disfavored procedural shortcut," but it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[19]

---

[14]*Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[15]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[16]*Adler*, 144 F.3d at 671.

[17]*White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

[18]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[19]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## Analysis[20]

As noted above, the following motions are now before the Court: Defendant's motion to sever the plaintiffs for trial, Defendant's motion to strike affidavits submitted by Plaintiffs in support of their response to Defendant's summary judgment motion, and Defendant's motion for partial summary judgment. The Court will address these motions in turn.

**Motion to Strike**

In its motion, Defendant asks the Court to strike four of the affidavits Plaintiffs attached to their response to its summary judgment motion. After reviewing the evidence in the record, the Court concludes that these affidavits are not necessary to the resolution of Defendant's summary judgment motion, and, thus, will decide the motion without relying on them. As a result, the Court denies Defendant's motion to strike as moot.

**Motion to Sever**

Pursuant to Fed. R. Civ. P. 42, Defendant argues that this action should be bifurcated for trial for two reasons: first, the only issue remaining for trial is the nature and extent of each of the

---

[20]Throughout its briefing, Defendant cites to conclusions made by this Court in *Coffeyville Res. Ref. & Mktg., LLC v. Liberty Surplus Insur. Corp.*, 08-1204-WEB, a case not involving the plaintiffs in this case, and claims that these conclusions have some type of preclusive effect in this litigation. *See, e.g.,* Doc. 141, p. 16 ("This Court (Judge Brown) has already made findings of fact and conclusions of law in companion litigation that require the inevitable conclusion that Coffeyville Resourses' conduct was not "wanton."). They do not. It is hornbook law in this jurisdiction, as it no doubt is in every other jurisdiction in the Union, that the doctrines of claim preclusion and issue preclusion apply only when the parties to the two actions are the same or are in privity with each other. *See, e.g., Winston v. Kan. Dep't of Soc. & Rehab. Servs.*, 274 Kan. 396, 413, 49 P.3d 1274, 1285, *cert denied*, 537 U.S. 1088 (2002) (claim preclusion); *Williams v. Evans*, 220 Kan. 394, 396, 552 P.2d 876, 878 (1976) (issue preclusion). Here, it has not been shown that Plaintiffs are in privity with the first case's parties. Accordingly, the Court rejects Defendant's request to give preclusive effect to the conclusions made in *Liberty Surplus Insurance Corp.*

plaintiffs' alleged damages,[21] which, according to Defendant, vary dramatically,[22] and second, trying the individual claims together will prejudice Defendant, as the jury will become confused because of the multitude of issues they will asked to decide and will likely believe that Defendant caused extensive damage to businesses and property in Coffeyville and did not take appropriate action. Defendant's arguments merit little response. Suffice it to say that the Court does not find them to be persuasive. Accordingly, the Court denies Defendant's motion to sever.[23]

**Motion for Summary Judgment**

Defendant raises two main arguments in its motion. The first is that summary judgment should be granted on Plaintiffs' nuisance theory. The second is that punitive damages are not a proper form of relief in this case. As shown below, neither of Defendant's arguments are meritorious.

*Plaintiffs' Nuisance Theory*

A private nuisance is a "condition or activity that interferes with the possessor's use and enjoyment of her land by incorporeal or non-trespassory invasions to such an extent that the landowner cannot reasonably be expected to bear without compensation."[24] Defendant argues that

---

[21]Defendant claims that this is so because it has already admitted liability. *See* Doc. 157, p. 1 (citing Doc. 17).

[22]There are six remaining plaintiffs in this case. According to Defendant, "[e]ach plaintiffs [sic] has uniquely individualized claims of damage due to the varied nature of the plaintiffs' properties, which range from agricultural to commercial, recreational to the hospitatily business." *See* Doc. 157, p. 2.

[23]*See, e.g., Belisle v. BNSF Ry. Co.*, 697 F. Supp. 2d 1233, 1250 (D. Kan. 2010). In their response, Plaintiffs propose, for purposes of trial, that the Court group the plaintiffs from this case and the ones in *Angleton v. Coffeyville Res. Ref. & Mktg.*, LLC, 08-1255-EFM, together based on where they reside. According to Plaintiffs' proposal, those plaintiffs that reside in Coffeyville should have their claims tried together, while those plaintiffs who live in Oklahoma should have their claims tried separately. Plaintiffs' proposal puts the proverbial cart in front of the horse. No motion to consolidate this case with *Angleton* has been filed. Accordingly, the Court will not address the hypothetical of what should be done if such a motion was granted.

[24]2 D.B. Dobbs, The Law of Torts § 463, at 1321.

it is entitled to summary judgment on Plaintiffs' nuisance claim for two reasons: first, Plaintiff cannot raise a genuine dispute of material fact as to whether it acted intentionally, and second, the oil release was an isolated incident of a temporary nature.

Defendant's first argument is flawed, as it misunderstands the state of the law in Kansas. A plaintiff need not establish that the defendant acted intentionally in order to prevail on a nuisance claim, rather, he can succeed on the alternative theories of negligence and strict liability.[25] Therefore, in light of this fact, and the fact that, based on the pretrial order, it does not appear that Plaintiffs have premised their nuisance claim on an intentional act theory, the Court concludes that Defendant's first argument is without merit, and, thus, fails to justify dismissal of Plaintiffs' nuisance claim.

As for Defendant's other argument, it too fails. In its briefing, Defendant cites to *H. Wayne Palmer & Associates v. Heldor Industries, Inc.*[26] In that case, citing to *Culwell v. Abbot Construction Co.*[27], this Court concluded that because the cause of the damage to the plaintiff's property, a fire, was a one-time isolated event, the defendant was entitled to summary judgment on the plaintiff's nuisance claim.[28] According to Defendant, the Court's conclusion in *Palmer* mandates summary judgment in its favor in this case because Plaintiffs' evidence shows that the oil spill was a one-time occurrence that lasted approximately one hour. The Court disagrees. While certain language in the *Palmer* decision could be construed to support Defendant's argument, the Court does

---

[25]*See, e.g., United Proteins, Inc. v. Farmland Indus., Inc.*, 259 Kan. 725, 732, 915 P.2d 80, 85 (1996) (citing *Culwell v. Abbot Constr. Co., Inc.*, 211 Kan. 359, 364, 506 P.2d 1191, 1196 (1973))

[26]839 F. Supp. 770 (D. Kan. 1993).

[27]211 Kan. 359, 506 P.2d 1191.

[28]*H. Wayne Palmer & Assocs.*, 839 F. Supp. at 777.

not believe that *Palmer* or the case cited therein stands for the proposition that that the plaintiff must show that the defendant repeatedly engaged in injurious conduct before a nuisance claim may lie.[29] Rather, based on the order as a whole and its citation to *Culwell*, the Court believes that the correct interpretation of *Palmer*, and, more importantly, the governing Kansas case law, is that the viability of a nuisance claim hinges upon whether the *cause* of the plaintiff's injuries had been in existence for a period of time instead of being an isolated instance of a temporary nature. Here, unlike in *Palmer*, the record suggests that the cause of the plaintiffs' damages, i.e., Defendant's oil, remained on their property for a period of time following the flood. Therefore, in light of this fact, the Court finds that *Palmer* is distinguishable. Additionally, it finds that Plaintiffs have presented enough evidence to survive summary judgment on the ground raised by Defendant. Accordingly, the Court denies Defendant's motion to the extent it seeks to have Plaintiffs' nuisance claim dismissed because it is based on a one-time event of a temporary nature.

### *Plaintiffs' Claim for Punitive Damages*

Defendant argues that it is entitled to summary judgment on Plaintiffs' claim for punitive damages for three reasons: first, there is no underlying cause of action that would support the issuance of punitive damages; second, its employees' conduct on June 30 and July 1 was not wanton; and third, it neither authorized nor ratified the conduct that caused the oil release during the flood. As explained more fully below, each of Defendant's arguments fail.

---

[29]This is not to say that a defendant's conduct is not material to determining the viability of a plaintiff's nuisance claim. Rather, as shown in the Court's summary judgment order in *Vowell v. Coffeyville Res. Ref. & Mktg., LLC*, 09-1303-EFM, (Doc. 52), the defendant's conduct is taken into account elsewhere in the analysis, such as determining when the statute of limitation begins to run.

Under Kansas law, "[a] verdict for actual damages is a prerequisite to the award of punitive damages."[30] Thus, at the summary judgment stage, the plaintiff must assert at least one viable theory of recovery on which punitive damages can be based. Here, as shown above, Plaintiffs have asserted a viable nuisance claim. Defendant has presented no argument for why punitive damages cannot be based on a nuisance claim. Moreover, the Court has found "no reason to doubt that Kansas courts would embrace the nuisance theory for punitive damages."[31] Therefore, in light of these facts, and the fact that "[i]t seems reasonable to assume that the [Kansas Supreme Court] would proceed by analogy to its negligence cases in which punitive damages have been awarded for pollution of waters or water courses,"[32] the Court rejects Defendant's first basis for seeking summary judgment on Plaintiffs' punitive damages claim.[33]

With regard to the two remaining bases, the Court makes short shrift of them. According to Defendant, Plaintiffs' punitive damages claim also fails because Plaintiffs have failed to raise a genuine dispute of material fact as to whether its employees acted wantonly and whether it authorized or ratified the alleged wrongful conduct, which is necessary to avoid summary judgment on a punitive damages claim.[34] The Court disagrees. After viewing the record as a whole, and in a light must favorable to Plaintiffs, the Court cannot say, as a matter of law, that no reasonable jury

---

[30]*Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, 740, 822 P.2d 617, 624 (1991).

[31]*Newman v. Nelson*, 350 F.2d 602, 604 (10th Cir. 1965).

[32]*Id.* at 604.

[33]Plaintiffs concede that punitive damages cannot be based on a claim brought under the Oil Pollution Act. *See* Doc. 32, p. 19 n.3.

[34]*See* K.S.A. 60-3702(c) & (d)(1) (stating that the plaintiff must show by clear and convincing evidence that the defendant acted willfully, wantonly, or maliciously, and, in cases arising out of an employee's conduct, that the employer ratified or authorized the employee's conduct).

could find that Defendant's employees acted wantonly and that Defendant ratified such conduct. Accordingly, judgment for Defendant on Plaintiffs' punitive damages claim is not proper at this time.

**IT IS THEREFORE ORDERED** that Defendant's motion to sever the plaintiffs for trial (Doc. 156) is hereby DENIED

**IT IS FURTHER ORDERED** that Defendant's motion to strike affidavits submitted by Plaintiffs in support of their response to Defendant's summary judgment motion (Doc. 153) is hereby DENIED AS MOOT.

**IT IS FURTHER ORDERED** that Defendant's motion for partial summary judgment (Doc. 140) is hereby DENIED.

**IT IS SO ORDERED**.

Dated this 19th day of April, 2011.

*[signature]*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE